**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HERIBERTO GIERBONLINI ORTIZ,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF YOUNGSTOWN, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:24-cv-33<br><br>Judge J. Philip Calabrese<br><br>Magistrate Judge Reuben J. Sheperd |

## <u>OPINION AND ORDER</u>

Plaintiff Heriberto Gierbonlini Ortiz, the property manager of a rental house in Youngstown, Ohio, brings this lawsuit against Defendants City of Youngstown and two police officers. After the tenant of the rental property went to the police and reported that she had been locked out of the house, Mr. Ortiz met officers at the property to try to resolve the dispute. Things quickly got out of hand. Officers arrested Mr. Ortiz and let the tenant back into the property. Mr. Ortiz brings various federal and State-law claims arising from his arrest and its aftermath. The parties each move for summary judgment. For the following reasons, the Court **DENIES** Plaintiff's motion for summary judgment and **GRANTS** Defendants' motion.

## FACTUAL AND PROCEDURAL BACKGROUND

On cross-motions for summary judgment, the Court construes the facts in Plaintiff's favor in ruling on Defendants' motion and in Defendants' favor in ruling on Plaintiff's motion. In this case, the parties largely agree on the facts and agree

that no material disputes of fact prevent ruling on summary judgment as a matter of law. Indeed, body camera footage captures much of what matters factually about Mr. Ortiz's arrest. Before turning to the facts that the body camera footage establishes, the Court addresses two matters.

*First*, this case takes place against the backdrop of Ohio law. Specifically, Section 5321.15 of the Ohio Revised Code expressly prohibits a landlord from engaging in self-help evictions. The statute includes "termination of utilities or services, exclusion from the premises, or threat of any unlawful act, against a tenant, or a tenant whose right to possession has terminated, for the purposes of recovering possession of residential premises." Ohio Rev. Code § 5321.15(A). In other words, if a tenant holds over, a landlord must go through the eviction process and obtain a court order to remove a tenant from the property. *See id.* § 5321.15(B); *id.* § 1923.02.

*Second*, the events captured on the body camera footage play out based on what the officers knew at the time they arrived at the rental property. The tenant, Deborah Rios, told the police that she resided at the property, had belongings there, and was unlawfully locked out. (ECF No. 57, PageID #1164–65; ECF No. 50-3, PageID #1015.) She presented a lease for the property that Wanda Diaz signed. (ECF No. 50-3, PageID #1016–17.) Plaintiff objects that Defendants rely on these hearsay statements for the truth of the matters asserted to defend their actions. (ECF No. 57, PageID #1164–65.) But these statements are not offered for their truth (indeed, they turn out *not* to be true in certain important respects). Instead, they provide necessary background for what the officers understood when they arrived at the rental property

and how that information shaped their decisions at the scene. (ECF No. 58-1, PageID #1185.) Without these statements, there is no reason to believe officers would have gone to the property in the first place.

In this respect, Rios's statements are *res gestae*, which applies equally in civil and criminal cases. Matters constituting a part of the res gestae are admissible in evidence, the rules as to admissibility, and as to what constitutes the res gestae, being the same in criminal as in civil cases. *West v. United States*, 258 F. 413, 419 n.2 (6th Cir. 1919). Generally, *res gestae* means "the events at issue or others contemporaneous with them." Black's Law Dictionary, *Res Gestae* (12th ed. 2024); *see United States v. Wilson*, 653 F. App'x 433, 442 n.5 (6th Cir. 2016) (quoting Bryan Garner, *Garner's Dictionary of Legal Usage*, 777–78 (3d. ed. 2011)). Under the law of this Circuit, use of *res gestae*, or background evidence, is proper where it "has a casual temporal, or spatial connection" with the claim. *United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015) (cleaned up). Background evidence is proper if it is a "prelude" to the claim or "completes the story" of the claim. *Id.* Accordingly, the Court **OVERRULES** Plaintiff's objection and considers these background facts not for their truth but to show what brought the officers to the rental property and what the responding officers understood when they arrived.

With that in mind, the record (mainly the body camera footage) establishes the following facts. Where the parties rely on facts that this footage clearly contradicts, the Court relies on the video to provide the undisputed record.

**A. The Rental Property**

Plaintiff Heriberto Gierbolini Ortiz is the property manager of a home located at 406 West Chalmers in Youngstown, Ohio. (ECF No. 49-1, PageID #710–11.) Mr. Ortiz's cousin owns the house but put him in charge of it when he moved back to Puerto Rico. (*Id.*) Mr. Ortiz takes care of the house and fixes it. (*Id.*, PageID #711.)

As the property manager, Mr. Ortiz allowed Deborah Rios to live in the house. (*Id.*) According to Mr. Ortiz, his mechanic told him that Ms. Rios needed a place to stay and asked if Mr. Ortiz would allow her to stay in the house. (*Id.*, PageID #712.) Mr. Ortiz told the mechanic that the house was "not ready to move in" but, if she wanted, he would allow her to stay in the house the way it was. (*Id.*)

Therefore, non-party Wanda Diaz, Mr. Ortiz's wife (as he refers to her, though they are not legally married (*id.*, PageID #699)), wrote Rios a letter saying that she could rent the property (*id.*, PageID #712–13). Diaz wrote the letter to allow Rios to put the utilities to the home in her name. (*Id.*, PageID #713.)

**B. The Tenant's Report at the Police Station**

On December 3, 2022, Deborah Rios went to the Youngstown police department to report that she was locked out of the house she was renting at 406 West Chalmers. (ECF No. 50-3, PageID #1015.) At the police station, Rios spoke with Officer Tyl Srbinovich, who is named as a Defendant in this case, and told him that the locks to her rental house were changed and that she was locked out. (*Id.*)

Rios identified the landlord and provided Diaz's phone number. (*Id.*, PageID #1017.) Also, she showed Officer Srbinovich an alleged rental agreement for the property. (*Id.*, PageID #1016.) According to Officer Srbinovich, the agreement was

dated three weeks earlier and contained a signature that was later verified to be that of Diaz. (*Id.*) Also, according to Officer Srbinovich, Rios said she still had property in the home. (*Id.*, PageID #1017.)

Based on his conversation with Rios, Officer Srbinovich called Diaz. (ECF No. 49-1, PageID #710; ECF No. 50-3, PageID #1019.) She answered the phone, but because Officer Srbinovich was unable to understand her, Diaz handed the phone to Mr. Ortiz. (ECF No. 49-1, PageID #710.) Officer Srbinovich told Mr. Ortiz that he was calling because Rios came to the police department to report that she was locked out of her rental house. (ECF No. 50-3, PageID #1018.) Then, Officer Srbinovich asked Mr. Ortiz to meet him at the property. (ECF No. 49-1, PageID #710, ECF No. 50-3, PageID #1018.) Mr. Ortiz agreed to meet Officer Srbinovich there. (*Id.*)

### C. The Interaction at the Rental Property

The entire interaction at 406 West Chalmers was captured on body camera footage. Officer Srbinovich and Officer Ivan Thomas, who is also named as a Defendant, arrived at the property at approximately 2:20 p.m. (Srbinovich Bodycam at 00:03.) They approached Mr. Ortiz, who was standing on the sidewalk in front of the property with Diaz. (*Id.* at 00:03–00:50.) Officer Srbinovich explained to Mr. Ortiz that, because Rios was given a chance to live at the property, she established residency under Ohio law. (*Id.* at 01:28–01:43.) Therefore, Officer Srbinovich told Mr. Ortiz that he could not "kick" Ms. Rios out of the house without an eviction notice. (*Id.* at 01:43–01:45.) Mr. Ortiz explained that "there was no way" because Rios "only stayed for three days." (*Id.* at 01:45–01:53.)

Then, Officer Srbinovich spoke to Rios, using the man in the car with her as a translator. (*Id.* at 01:54–2:05.) He asked Rios how much "stuff" she had in the house, which she confirmed was a little. (*Id.* at 02:05–02:20.) Also, Officer Srbinovich asked Rios when she moved into the property. (*Id.* at 02:22–02:28.) She said that she moved in two to three weeks ago. (*Id.*) Then, Officer Srbinovich went back to speak with Mr. Ortiz and told him that Rios said she was living there for two to three weeks, which was confirmed by the contract Diaz wrote. (*Id.* at 02:30–03:00.) Again, Officer Srbinovich explained to Mr. Ortiz that Rios established residency and that Mr. Ortiz could not change the lock and "kick" Ms. Rios out of the house without an eviction notice. (*Id. at* 03:01–03:04.) Therefore, Officer Srbinovich explained that Rios needed to be let back into the house "right now." (*Id.* at 03:04–03:10.)

Mr. Ortiz said, "okay no problem," but stated that Rios needed to pay him the "rent, deposit, and security." (*Id.* at 03:05–03:15.) Officer Srbinovich told Mr. Ortiz that he "needed to open the door"; then, if Ms. Rios does not pay, Mr. Ortiz would have to take her to court and sue her for the money. (*Id.* 03:15–03:21.) Mr. Ortiz continued to try to explain his side of the story to Officer Srbinovich, to which Officer Srbinovich repeatedly explained that Rios established residency under Ohio law. (*Id.* at 03:21–04:05.)

As the conversation continued, Mr. Ortiz became visibly upset and told Officer Srbinovich that he was going to show the officers the inside of the house. (04:05–04:10.) Officer Srbinovich responded by telling Mr. Ortiz "what was going to happen," which was that he was going to let Rios into the house, and they would refer the

matter to the community policing unit. (*Id.* at 04:10–04:30.) Officer Srbinovich explained that the unit would then assess whether the house was livable; if it was not, then the unit would post an eviction notice and not let Rios live there. (*Id.* at 04:30–04:42.) But if the property was deemed habitable, then it would be Mr. Ortiz's responsibility to get an eviction notice. (*Id.* at 04:42–04:46.) Either way, Officer Srbinovich explained that "right now the door gets opened" and Rios would be let into the house. (*Id.*) He insisted that Mr. Ortiz would have to open the door while officers were at the property. (*Id.* at 05:23–05:25.)

#### C.1. Officers Enter the Property

Following this initial conversation, the officers walked with Mr. Ortiz to the front door of the house. (*Id.* at 05:25–06:30.) Then, Mr. Ortiz grabbed his keys and walked to the back of the house. (*Id.* at 06:30.) A short time later, Mr. Ortiz opened the front door and invited the officers to "come in." (*Id.* at 07:00–07:03.) The officers followed Mr. Ortiz into the house. (*Id.* at 07:03–07:15.) Once inside, the conversation continued. (*Id.* at 07:15–07:40.) Again, Mr. Ortiz told the officers that he was not going to let Rios into the house, to which Officer Srbinovich responded that Rios established residency so she would be coming into the house. (*Id.* at 07:40–07:47.)

Officer Srbinovich told Mr. Ortiz that his only option was to let Rios into the house. (*Id.* at 07:45–07:47.) But Mr. Ortiz remained adamant and told the officers that they will have to "take him to jail or do whatever they want to do," but he will not let Rios into the house. (*Id.* at 07:47–08:00.) The officers continued to discuss the matter with Mr. Ortiz until Officer Srbinovich went to ask Rios if she wanted to stay at the property until evicted. (*Id.* at 08:00–11:45.) Officer Srbinovich went outside

to speak with Rios (*id.* at 11:35–11:46), who confirmed that she wished to stay because she had nowhere else to go (*id.* at 12:03–13:11).

Knowing that Rios had nowhere else to go, Officer Srbinovich went back into the house. (*Id.* at 13:12–13:22.) He told Mr. Ortiz that Rios had nowhere else to go and that she established residency, so she would be staying at the house. (*Id.* at 13:24–13:40.) Mr. Ortiz again said no, but this time told the officers to "kill me" and walked away. (*Id.* at 13:42–13:44.) The officers followed Mr. Ortiz back into the house. (*Id.* at 13:45.)

### C.2. The Conversation Continues

After Mr. Ortiz told the officers that they were going to have to "kill him," Officer Srbinovich tried to explain the situation to Diaz to see if she could talk to Mr. Ortiz. (*Id.* at 13:46–15:50.) Diaz did not speak to Mr. Ortiz; instead, he began to pace back and forth across the house as he became visibly more upset. (*Id.* at 15:51–16:17.) Officer Srbinovich told Mr. Ortiz that he understood his position after trying to help Rios but, again, explained that he would have to evict Rios through the courts. (*Id.* at 16:20–19:30.)

Eventually, Officer Srbinovich told Mr. Ortiz that the issue was going to be resolved for the time being. (*Id.* at 19:38–19:40.) To do that, Officer Srbinovich suggested that everyone leave the house to allow Rios to come in and then let the courts handle the matter moving forward. (*Id.* at 19:38–19:42.) However, Mr. Ortiz continued to say that he would not let Rios in the house. (*Id.* at 19:42–21:30.)

At one point, Mr. Ortiz tried to tell the officers that the house was his residence and he lived there, but later he indicated he only stayed there when working on the

house. (*Id.* at 21:30–21:42.) Officer Srbinovich told Mr. Ortiz that there was a difference between residing somewhere and staying somewhere temporarily. (*Id.* at 21:42–21:50.) Finally, Officer Srbinovich told Mr. Ortiz, "we are done here" and forcefully told Mr. Ortiz that the property was not his house and he did not live there. (*Id.* at 21:55–22:05.)

Then, Officer Srbinovich stepped out onto the porch and took a piece of mail from the mailbox, which was from the gas company and addressed to Rios. (*Id.* at 22:06–22:46.) Officer Srbinovich explained that even if Rios was only in the house for three days as Mr. Ortiz claimed, the fact that she received mail there supported her right to be in the house. (*Id.* at 22:50–22:54.) Then, Officer Srbinovich explained that Mr. Ortiz did not have the 406 West Chalmers address on his identification and that he did not have mail addressed to him, so he could not be staying at the property. (*Id.* at 22:55–23:00.) Again, Officer Srbinovich told Mr. Ortiz that it was time for him to leave, but Mr. Ortiz walked further into the house and away from the officers. (*Id.* at 23:00–23:10.)

### C.3. The Situation Escalates

Mr. Ortiz told the officers again that he would not leave and began to raise his voice. (*Id.* at 23:10–23:30.) Mr. Ortiz grew visibly more upset—pacing back and forth, rubbing his hands together, and eventually gripping his head. (*Id.* at 23:31–24:15.) Then, Officer Srbinovich informed Mr. Ortiz that a supervisor was on the way. (*Id.* at 24:17–24:23.) Again, Mr. Ortiz exclaimed that the officers were "going to have to kill" him because he would not leave the house. (*Id.* at 24:24–24:39.)

Because of Mr. Ortiz's statements that the officers would have to kill him, Officer Srbinovich asked Diaz whether there were any weapons in the house, and she confirmed there were not. (*Id.* 24:39–24:42.) Then, Officer Srbinovich asked Mr. Ortiz if he "had anything on him," prompting Mr. Diaz to reach into his pocket, pull out a pocketknife, and gently toss it on the couch in front of him. (*Id.* at 24:24–24:47.) Mr. Ortiz said that he did not have any other weapon. (*Id.* at 24:48–24:50.)

Then, Mr. Ortiz began to walk out of the view of the officers, but Officer Srbinovich quickly asked him to stay where the officers could see him. (*Id.* at 24:51–25:01.) Again, Officer Srbinovich asked Mr. Ortiz if he had a weapon and told him that the officers were going to pat him down just to be sure. (*Id.* at 25:10–25:17.) Officer Srbinovich approached Mr. Ortiz and asked him to turn around and face the other way. (*Id.* at 25:18–25:21.) But Mr. Ortiz immediately shook his head no and put his arms out to his side before lifting his shirt and pulling out his pockets. (*Id.* at 25:29–25:35.) He told Officer Srbinovich that he could pat him down but that he does not have to grab him. (*Id.* at 25:35–25:36.) Officer Srbinovich explained that he wanted to make sure that Mr. Ortiz had no weapon. (*Id.* at 25:38–25:44.)

Mr. Ortiz refused to turn around and began backing up toward the wall. (*Id.* at 25:45–25:51.) Officer Srbinovich told Mr. Ortiz that was enough and grabbed him by the arm. (*Id.* at 25:51–25:54.) Mr. Ortiz became agitated, tried to get away from the officers, and asked if they wanted to fight. (*Id.* at 25:55–26:03.) At that point, Officer Srbinovich told Mr. Ortiz that he is being detained. (*Id.* at 26:03–26:04.) Officer Thomas pulled out his handcuffs, and Mr. Ortiz tried to run away from the

officers. (*Id.* at 26:04–26:07.) The officers and Mr. Ortiz began to fight until the officers were able to get him to the ground. (*Id.* at 26:07–26:17.)

Once on the ground, Mr. Ortiz continued to resist the officers, resulting in the officers pulling out their tasers and warning Mr. Ortiz that he will be tased if he continued to resist. (*Id.* at 26:17–27:00.) Repeatedly, the officers asked Mr. Ortiz to roll over onto his stomach, but he refused and continued to resist. (*Id.* at 27:00–27:17.) When backup arrived, the officers forcibly handcuffed Mr. Ortiz. (*Id.* at 28:34–29:00.)

Once Mr. Ortiz was handcuffed and detained, the officers escorted him outside. (*Id.* at 29:00–29:13.) He willingly left the house in handcuffs. (*Id.* at 29:13–29:36.) At the cruiser, Officer Srbinovich patted down Mr. Ortiz. (*Id.* at 29:37–30:15.) Before putting Mr. Ortiz in the backseat, the officers adjusted his handcuffs. (*Id.* at 30:17–31:20.) Mr. Ortiz willingly got in and sat in the backseat of the cruiser. (*Id.* at 31:20–31:34.)

### C.4. Transport and Hospital Stay

Following his arrest, Officer Srbinovich transported Mr. Ortiz to the local jail. (ECF No. 50-3, PageID #1029.) When Mr. Ortiz "quit responding and seemed to be unable to walk or talk" (ECF No. 49-2, PageID #830), Officer Srbinovich called an ambulance to take him to the hospital (ECF No. 50-3, PageID #1029). In the ambulance, paramedics administered Narcan. (ECF No. 50-7, PageID #1071–72.) Officer Srbinovich followed the ambulance to the hospital. (*Id.*)

At the hospital, Mr. Ortiz was able to communicate by nodding yes and no and by using hand signals. (ECF No. 49-2, PageID #830.) Eventually, Mr. Ortiz began

mouthing words and later began yelling. (*Id.*) However, he was still unable to move his right arm or legs because "they felt numb." (*Id.*) When Mr. Ortiz was not being examined, he was observed moving his arms and legs. (*Id.*)

Mr. Ortiz was admitted to the hospital from the emergency department because of altered mental status. (*Id.*, PageID #796.) He was in the hospital for five days. (*Id.*) During his hospital stay, he was mainly treated for his uncontrolled diabetes. (ECF No. 50-7, PageID #1070.)

Mr. Ortiz was charged in municipal court with obstructing official business, resisting arrest, and menacing—all misdemeanors. (ECF No. 3, PageID #39–42.) Later, all charges were dismissed. (*Id.*)

### D. Plaintiff's Claims

Based on these events, Mr. Ortiz filed a complaint under Section 1983 and State law against the City of Youngstown, Officer Tyl Srbinovich, and Officer Ivan Thomas. (ECF No. 1.) Mr. Ortiz asserts numerous Section 1983 claims against all Defendants: First Amendment retaliation (Count I); unlawful search and seizure in violation of the Fourth Amendment (Count II); excessive force in violation of the Fourth Amendment (Count III); violation of his procedural due process rights (Count IV); and malicious prosecution (Count V). (*Id.*) Further, Plaintiff asserts claims against Defendant City of Youngstown under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). (*Id.*) Plaintiff brings State-law claims against the officers for battery (Count VI), false imprisonment (Count VII), and loss of consortium (Count VIII). However, because Mr. Ortiz and Diaz are not legally

married, the Court previously dismissed Plaintiff's loss of consortium claim and Diaz's claims against all Defendants. (ECF No. 19.)

## ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the claim or defense at issue. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 & n.12 (6th Cir. 1989); *Chappell v. City of Cleveland*, 584 F. Supp. 2d 974, 988 (N.D. Ohio 2008). After discovery, summary judgment is appropriate if the nonmoving party fails to establish "an element essential to that party's case and upon which that party will bear the burden of proof at trial." *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The Court's function at this stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The party seeking summary judgment has the initial burden of informing the court of the basis for its

motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Tokmenko*, 488 F. Supp. 3d at 576 (citing *Celotex Corp.*, 477 U.S. at 322). Then, the nonmoving party must "set forth specific facts showing there is a genuine issue for trial." *Id.* (citing *Anderson,* 477 U.S. at 250). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

If a genuine dispute exists, meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate. *Tokmenko*, 488 F. Supp 3d at 576 (citing *Anderson*, 477 U.S. at 250). However, if "the evidence is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Id.* The "mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48). "Just as a plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (cleaned up) (citations omitted). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009)).

To determine whether a genuine dispute about material facts exists, it is not the Court's duty to search the record; instead, the parties must bring those facts to the Court's attention. *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). Ultimately, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251.

"[W]here, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). Therefore, cross-motions for summary judgment do not warrant granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed. *Langston v. Charter Twp. of Redford*, 623 F. App'x 749, 755 (6th Cir. 2015).

To the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed "in the light depicted by the videotape." *Scott*, 550 U.S. at 380–81. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

## I. Section 1983

Section 1983 provides a federal cause of action to a person whose rights "secured by the Constitution" are violated by an official acting "under color of [State law]." 42 U.S.C. § 1983. In this way, Section "1983 creates a species of tort liability" where State actors violate federal constitutional rights. *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (citation omitted). "The first inquiry in any § 1983 suit is to isolate the precise constitutional violation" alleged. *Graham v. Connor*, 490 U.S. 386, 394 (1989) (internal quotation marks and citation omitted). "After pinpointing" the constitutional right at issue, "courts still must determine the elements of, and rules associated with, an action seeking damages for its violation." *Manuel v. City of Joliet*, 580 U.S. 357, 370 (2017) (citation omitted). Under Section 1983, "the general 'common law of torts'" bridges the gap between a constitutional right and the elements of a cause of action. *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160 (6th Cir. 2021) (citation omitted).

Plaintiff alleges that the officers entering the property at 406 West Chalmers, ordering him to leave, and ultimately arresting him violated the First, Fourth, and Fourteenth Amendments. (ECF No. 1., ¶¶ 96–140, PageID #11–15.) Under the First Amendment, he contends that the officers retaliated against him for his comments by seizing, searching, arresting, and using excessive force against him. (*Id.*, ¶¶ 96– 100, PageID #11.) Under the Fourth Amendment, Plaintiff alleges that the officers conducted an unlawful search and seizure by entering the property and seizing him without probable cause or a warrant. (*Id.*, ¶¶ 102–12, PageID #12–13.) Additionally, Plaintiff asserts a Fourth Amendment violation on the basis of the

excessive force used during his arrest. (*Id.* ¶¶ 113–19, PageID #13.) Also, he alleges that the officers arrested and prosecuted him without probable cause, in violation of the Fourth Amendment. (*Id.*, ¶¶ 132–140, PageID #14–15.) Under the Fourteenth Amendment, Plaintiff alleges that the officers violated his right to due process by depriving him of the right to property when they ordered him to allow Rios to take possession of the rental home. (*Id.*, ¶¶ 120–131, PageID #13–14.)

The parties filed cross-motions for summary judgment on all of Plaintiff's claims under Section 1983. (ECF No. 50; ECF No. 52.) The Court takes up each in turn.

**I.A. First Amendment Retaliation (Count I)**

"Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Since the Supreme Court assumed the Due Process Clause of the Fourteenth Amendment applies this protection against the States, *see Gitlow v. New York*, 268 U.S. 652, 666 (1925), courts recognize that State and local officials may not abridge the freedom of speech either, *see, e.g.*, *Reguli v. Russ*, 109 F.4th 874, 880 (6th Cir. 2024) (per curiam). "[A]s a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

To state a claim for retaliation in violation of the First Amendment, a complaint must allege three elements. First, the plaintiff must have engaged in speech that the First Amendment protects. *Reguli*, 100 F.4th at 874 (citing *Rudd v. City of Norton Shores*, 977 F.3d 503, 513–14 (6th Cir. 2020)). Second, the defendant must have taken adverse or harmful action against the plaintiff, such as "an arrest,

a prosecution, or a dismissal from governmental employment." *Id.* (quoting *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022); *Lemaster v. Lawrence Cnty.*, 65 F.4th 302, 307 (6th Cir. 2023)). Third, the complaint must allege a causal connection between the protected speech and the adverse action. *Id.* (citing *Rudd*, 977 F.3d at 515).

On the undisputed facts shown on the body camera footage, construed in Plaintiff's favor, no reasonable juror could find that Officer Srbinovich and Officer Thomas arrested Mr. Ortiz based on his speech, assuming he engaged in protected speech by criticizing or arguing with the police. Instead, the record leaves no doubt that Mr. Ortiz had a weapon and that officers arrested him when he refused to cooperate with a pat down to ensure their safety. In short, even taking the facts in the light most favorable to Plaintiff, the record would not support a verdict finding that officers arrested Mr. Ortiz based on a verbal disagreement, criticism of the police, or other activity that the First Amendment protects.

### I.B. Fourth Amendment Claims (Counts II, III, and V)

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. Against the framework this Amendment establishes, Plaintiff brings three claims: (1) unlawful search and seizure; (2) excessive force; and (3) malicious prosecution.

**I.B.1. Unlawful Search (Count II)**

Plaintiff asserts that the officers "ordered" him to come to the property to try to resolve the dispute between Rios and him. (ECF No. 52, PageID #1093.) Once at the property, he claims that Officer Srbinovich ordered him to allow the officers inside without any reasonable suspicion of a crime and without the authority to intervene in a landlord-tenant dispute. (*Id.*)

Ordinarily, the Fourt Amendment prohibits warrantless entry into one's house. But there is an exception. An individual with authority over the property may voluntarily consent to the search. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citations omitted). "It is well-settled that a person may waive his Fourth Amendment rights by consenting to a search." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004). Consent "'may be in the form of words, gesture, or conduct.'" *Id.* (citing *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976)).

**I.B.1.a. Consent**

Based on the body camera footage, there is no doubt that Mr. Ortiz invited the officers into the house at 406 West Chalmers. It shows that Mr. Ortiz and Diaz, along with the officers, walked to the front of the house. (Srbinovich Bodycam at 05:25–06:30.) Then, Mr. Ortiz leaves them standing on the porch and walks around the side of the house toward the back. (*Id.* at 06:30.) A short time later, Mr. Ortiz reappears as he opens the front door from inside the house. (*Id.* at 07:00–07:03.) After opening the door, Mr. Ortiz casually tells the officers to "come in." (*Id.*) Only then did the officers enter the house. (*Id.* at 07:03–07:15.) Based on the body camera video, no reasonable jury could find anything other than that Mr. Ortiz invited the officers into

the house. *Scott*, 550 U.S. at 380–81. Therefore, as a matter of law, Mr. Ortiz consented to their entry.

**I.B.1.b. Free and Voluntary**

Still, Mr. Ortiz's consent must be given freely and voluntarily. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). "Whether consent was free and voluntary so as to waive the warrant requirement of the Fourth Amendment is 'a question of fact to be determined from the totality of all the circumstances.'" *Carter*, 378 F.3d at 588 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). But there is "no magic formula or equation" that determines the voluntariness of consent. *Id.*

Here, Mr. Ortiz freely left the conversation on the front porch to go to the back of the house and unlock the door for the officers. (Srbinovich Bodycam at 06:30–07:03.) Throughout their discussions, Officer Srbinovich repeatedly told Mr. Ortiz that he had no choice but to open the door. (*See id.* at 04:10–04:30 & 04:42–04:46.) Still, Mr. Ortiz decided to open the door and invited the officers inside. (*Id.*, at 06:30–07:30.) That fact does not make the consent somehow involuntary. Indeed, once inside the house, Mr. Ortiz tells the officers that how they can see what he was talking about, that Rios had no property there. (*Id.* at 07:10–07:17.) Then, Officer Srbinovich told Mr. Ortiz that he did not need to go through the house, but Mr. Ortiz insisted. (*Id.* at 07:17–07:25.) These discussions confirm the voluntariness of the invitation, at least within the meaning of the Fourth Amendment.

Taking a further step back, Plaintiff contends that Officer Srbinovich demanded that Mr. Ortiz meet him at the property, making the entire encounter unlawful. (ECF No. 52, PaegID #1088.) Again, however, the record leaves no doubt

that Mr. Ortiz freely and voluntarily met the officers at the property. Accordingly, there is no genuine dispute of material fact on this claim, and Defendants are entitled to judgment as a matter of law on it.

**I.B.2. Unlawful Seizure (False Arrest) (Count II) and Malicious Prosecution (Count V)**

When Officers Srbinovich and Thomas arrested Mr. Ortiz, they "seized" his person within the meaning of the Fourth Amendment. *Torres v. Madrid*, 529 U.S. 306, 312 (2021). Therefore, the Fourth Amendment requires that seizure to be reasonable. An arrest is "unreasonable" where it is not "'based on probable cause' to believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 192 (2013) (quoting *Dunaway v. New York*, 442 U.S. 200, 213 (1979)). "This probable-cause standard applies to all 'seizures' up to the jury trial." *Jones v. Clark Cnty.*, 959 F.3d 748, 770 (6th Cir. 2020) (Murphy, J., concurring in part and dissenting in part) (citing *Manuel*, 580 U.S. at 369 n.8).

Under Section 1983, an unreasonable seizure is not an actionable claim unto itself. "To determine the elements of a constitutional claim under § 1983," courts "look to the elements of the most analogous tort as of 1871 when § 1983 was enacted." *Thompson v. Clark*, 596 U.S. 36, 43 (2022); *Heck*, 512 U.S. at 483. The most analogous torts at common law to an unreasonable seizure of a person are false arrest and malicious prosecution. *Heck*, 512 U.S. at 484. At common law, false arrest (and false imprisonment) applied to detention without legal process. Malicious prosecution is the common law tort for "confinement imposed pursuant to legal process," such as pursuant to an arrest warrant or indictment. *Id.* These common-law torts are apt

analogies because they represent "specific versions of a general unreasonable-seizure claim alleging the same constitutional theory: that the officers seized . . . [Plaintiff] without probable cause." *Dibrell*, 984 F.3d at 1161.

In the language of the Fourth Amendment, arrests without probable cause are "unreasonable." Conversely, where probable cause supports an arrest, the seizure of a person is reasonable under the Constitution. The absence of probable cause for an arrest is an element of claims at common law for both false arrest and malicious prosecution. *Voyticky v. Village of Timberlake*, 412 F.3d 669, 675, 677 (6th Cir. 2005).

Probable cause to arrest is "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). It means "reasonable grounds for belief, supported by less than prima facie proof, but more than mere suspicion" of guilt. *United States v. Lattner*, 385 F.3d 947, 951 (6th Cir. 2004) (cleaned up); *see also United States v. Padro*, 52 F.3d 120, 122–23 (6th Cir. 1995) (citing *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). Ultimately, the determination of probable cause involves a practical, commonsense review of the totality of the available facts and circumstances. *Padro*, 52 F.3d at 123 (citations omitted); *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The standard is objective; "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996).

**I.B.2.a. False Arrest**

In this case, the bodycam footage leaves no doubt that Mr. Ortiz told the officers that they would have to shoot him or kill him. Once the officers were inside the house, Mr. Ortiz tossed a pocketknife onto a couch then refused to comply with a pat down for the officers' safety (an objectively reasonable request under the

circumstances) or to turn away from the officers to allow them to conduct the pat down. Instead of complying with the lawful orders of the officers, Mr. Ortiz challenged them to fight and attempted to flee, creating a danger for all those on the scene. His escalating conduct gave the officers probable cause for an arrest, making his seizure reasonable under the Fourth Amendment.

**I.B.2.b. Malicious Prosecution**

To prevail on a malicious prosecution claim under 42 U.S.C. § 1983, a plaintiff must prove that (1) "the defendant made, influenced, or participated in the decision to prosecute the plaintiff"; (2) there was no probable cause for the prosecution; (3) the plaintiff suffered a deprivation of liberty, apart from the initial arrest, as a result of the legal proceedings; and (4) the criminal proceeding was resolved in the plaintiff's favor. *France v. Lucas*, 836 F.3d 612, 625 (6th Cir. 2016). A plaintiff must satisfy all four elements. Because the officers had probable cause to arrest Mr. Ortiz, as explained above, Plaintiff cannot, as a matter of law, establish an element necessary to prove this claim. Therefore, Defendants are entitled to a summary judgment on it.

**I.B.3. Excessive Force (Count III)**

"The police must act reasonably when seizing a person." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (citing U.S. Const. amends. IV & XIV). Using excessive force is unreasonable. *Id.* "Courts reviewing § 1983 claims alleging excessive force must first consider whether the officer violated the constitution by using excessive force, then decide whether the officer deserves qualified immunity because he did not violate 'clearly established' federal law." *Wysong v. City of Heath*, 260 F. App'x 848, 854 (6th Cir. 2008). "Whether an officer's use of force in effecting

an arrest violates the Fourth Amendment turns on 'whether the officer['s] actions are objectively reasonable in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.'" *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at 397 (1989)).

Careful attention must be paid to "the facts and circumstances of . . . [the] case . . . ." *Graham*, 490 U.S. at 396 (citation omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation omitted). Police officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Plaintiff maintains that the officers physically seized Mr. Ortiz, forced him to the ground, applied weight to his back, then tased him. (ECF No. 52, PageID #1090.) Also, they slammed his head into a police cruiser with sufficient force to cause physical harm. (*Id.*)

Here, the record shows that Mr. Ortiz's conduct escalating from verbal noncompliance to active resistance. Even though he had a weapon, he resisted a brief pat down and attempted to flee. As the video footage shows, the officers used only the force necessary to subdue Mr. Ortiz and take him into custody. Contrary to Plaintiff's claims, once handcuffed, the officers' use of force stopped. They escorted Mr. Ortiz from the house outside to the cruiser. At his request, they loosened the handcuffs, and they made sure he was placed in the back of the cruiser without

incident. For these reasons, the record leaves no doubt, and would not permit a reasonable juror to find, that the officers did not use constitutionally excessive force.

### I.C. Due Process

For a procedural due process claim, a plaintiff must establish a constitutionally protected liberty or property interest and show that such an interest was deprived without appropriate process. *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 762–63 (6th Cir. 2005) (citing *Board of Regents v. Roth*, 408 U.S. 564, 569–70 (1972)). Then, the inquiry becomes "whether the deprivation of that interest contravened notions of due process." *Id.* (quoting *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002)). At bottom, due process requires that a person be "given notice of the case against him" and "opportunity to meet it." *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 348–49 (1976)).

Plaintiff bases his procedural due process claim on his property or possessory interest in the house at 406 West Chalmers. But Mr. Ortiz was not deprived of that right without due process. To the contrary, against the backdrop of Ohio law, the officers acted based on the information available to them at the time to ensure that Mr. Ortiz and Rios each had the opportunity that Ohio law affords them to secure their respective rights and interests in the property. Plaintiff mounts no challenge to the constitutionality of Section 5321.15 of the Ohio Revised Code, so the Court has no occasion to consider it. Where the substantive law of the State forecloses self-help measures to evict a tenant or other person, a due-process claim will not lie where officers act to give effect to that State law.

* * *

"Qualified immunity protects state officers against section 1983 claims unless (1) 'they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time' of the offense." *Novak v. City of Parma*, 33 F.4th 296, 303 (6th Cir. 2022) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)). For a right to be clearly established, it "must be sufficiently clear [such] that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quotations omitted) (cleaned up). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Rather than defining a clearly established right at a high level of generality, "clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). The Court may address the two inquiries in either order, and Plaintiff bears the burden on each. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Because the record establishes that the officers did not, as a matter of law, violate a constitutional right of Mr. Ortiz, the Court need not proceed further in analyzing the availability of qualified immunity as a defense.

### I.D. *Monell Liability*

A municipality "may not be sued under Section 1983 for an injury inflicted solely by its employees or agents." *Monell v. Department of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (2018). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* "There can be no liability under *Monell* without an underlying constitutional violation." *Robertson*, 753 F.3d at 622. The "conclusion that no officer-defendant has deprived the plaintiff of any constitutional right a fortiori defeats a claim against the government entity as well." *Scott v. Clay Cnty.*, 205 F.3d 867, 879 (6th Cir. 2000) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799)) (cleaned up). Because Defendants are entitled to summary judgment on all of Plaintiff's Section 1983 claims, the Court determines that Plaintiff cannot maintain a *Monell* claim. Therefore, Defendants are also entitled to summary judgment on this claim.

## II. State-Law Claims

Plaintiff brings State-law claims for battery and false imprisonment. (ECF No. 1, ¶¶ 141–48, PageID #15–16.) The Court has supplemental jurisdiction over Plaintiff's State-law claims pursuant to 28 U.S.C. § 1367. Under federal law "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). This grant of jurisdiction brings all claims arising from a common nucleus of operative fact before

the Court. *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 588 (6th Cir. 2016). Even then, a court "may decline to exercise supplemental jurisdiction" in certain circumstances. 28 U.S.C. § 1367(c). Supplemental jurisdiction "is a doctrine of discretion." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966). To determine whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity[.]" *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also James v. Hampton*, 592 F. App'x 449, 462–63 (6th Cir. 2015) (quoting *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1882 (6th Cir. 1993)). Section 1367(c)(3) provides that a district court may decline to exercise supplemental jurisdiction where "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."

Because the Court grants summary judgment for Defendants on all of Plaintiff's federal claims, the Court may, in its discretion, either retain jurisdiction over Plaintiff's State-law claims and proceed on the merits, *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639–40 (2009), or decline jurisdiction and dismiss the complaint without prejudice to Plaintiff's right to pursue the remaining claims in State court. *See* 28 U.S.C. § 1367(c)(3). "[G]enerally 'when all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing

the [S]tate law claims." *Packard v. Farmers Ins. Co. of Columbus*, 423 F. App'x 580, 585 (6th Cir. 2011) (quoting *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996)); *see also Juergensen v. Midland Funding, LLC*, No. 5:18-cv-1825, 2018 WL 5923707, at *2 (N.D. Ohio Nov. 13, 2018).

Based on its review of the record, the Court declines to exercise its discretion to retain supplemental jurisdiction over Plaintiff's State-law claims. Accordingly, the Court **DENIES WITHOUT PREJUDICE** Defendants' motion for summary judgment on Plaintiff's State-law claims and **DISMISSES** them **WITHOUT PREJUDICE**.

## CONCLUSION

For the foregoing reasons, the Court **OVERRULES** Plaintiff's evidentiary objection, **DENIES** Plaintiff's motion for summary judgment (ECF No. 52), and **GRANTS IN PART** Defendant's motion for summary judgment (ECF No. 50). Further, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiff's State-law claims.

**SO ORDERED.**

Dated: September 22, 2026

J. Philip Calabrese
United States District Judge
Northern District of Ohio